# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-0286
Filed February 11, 2026

———————————

**Emily F. Mairose,**
Plaintiff–Appellee,

v.

**Tayten J. Darnell,**
Defendant–Appellant.

———————————

Appeal from the Iowa District Court for O'Brien County,
The Honorable Shayne Mayer, Judge.

———————————

**AFFIRMED AS MODIFIED AND REMANDED**

———————————

Brandon J. Krikke and Ashley A. DeBoer of Dekoter, Thole, Dawson,
Rockman & Krikke P.L.C., Sibley, attorneys for appellant.

Patrick N. Murphy and Jacqueline L. Grotewold of Murphy, Collins &
McGill, PLC, Le Mars, attorneys for appellee.

———————————

Considered without oral argument
by Tabor, C.J., and Ahlers and Langholz, JJ.
Opinion by Langholz, J.

1

**LANGHOLZ, Judge.**

A young couple—Emily Mairose and Tayten Darnell—broke up about six months after welcoming their daughter. In the year that followed, Emily routinely kept Tayten in the dark about their daughter's whereabouts and needs. She moved the daughter's daycare five times in ten months, all without consulting Tayten. She outright refused to tell Tayten where she and the daughter were living. And she misrepresented when the daughter was taken for medical treatment. After a two-day trial to establish custody, visitation, and child support under Iowa Code chapter 600B (2024), the district court ordered joint legal custody, placed the daughter in Emily's physical care with liberal visitation for Tayten, and awarded Emily child support. Tayten now appeals.

After our careful review of the record, we modify that physical-care determination. While Emily has indeed been the daughter's historical caregiver, that preeminence was achieved in part by improperly withholding Tayten's parenting time and freezing him out of parenting decisions. And in Emily's care, the daughter has not enjoyed the kind of stability that normally colors our hesitation to disrupt a child's entrenched home environment. Thus, considering which placement would best provide stability for the daughter and foster her relationships with *both* parents, we modify the decree to place the daughter in Tayten's physical care. We also remand the case to the district court to establish a visitation schedule for Emily and calculate an appropriate child-support award. And we decline Emily's request for appellate attorney fees.

### I.    Factual Background and Proceedings

Emily and Tayten met in fall 2021—Emily was nineteen years old, had just graduated from high school, and was attending community college;

Tayten was twenty-three years old and working as a plow operator. A few months after meeting, Emily moved in with Tayten and his mother, Brenda, in Sibley, Iowa. And in October 2022, the couple welcomed a daughter.

After the birth, Emily did not work outside the home. Rather, she cared for the daughter and told Tayten and Brenda that she was taking online college classes. At least every other day, she would leave the baby in Brenda's care while she went up to her room to "do her college work on the computer." After about five months of this arrangement, Brenda stumbled upon letters from the community college demanding a return of the computer as Emily was no longer enrolled and had not attended a class since before the baby's birth. Even so, Brenda continued to provide substantial care—she ran a daycare for a decade and now works flexible hours providing home healthcare and cleaning, which allowed her to help care for the daughter during the day.

Emily and Tayten's relationship became strained, culminating in Brenda asking Emily to leave the home in May 2023. Emily left with the daughter and refused to tell Tayten where they were living. Around June, Emily and Tayten negotiated a coparenting schedule, with Tayten having the daughter on Wednesdays and every other weekend. That arrangement seemingly continued without issue—though the parents did drop-offs in Sibley and Emily continued to withhold where she and the daughter were living—until September. Emily then sued under chapter 600B to establish custody, visitation, and support. The court later entered a temporary-matters order establishing temporary joint legal custody, placing the daughter in Emily's physical care, and setting a visitation schedule for Tayten. The court reasoned that "[a]bsent a showing of abuse or neglect, or the basic needs are not being met, the Court is reluctant to disturb the status quo" pending a final physical-care decision.

Before and during this case, Emily regularly lied to Tayten, withheld information about the daughter, and otherwise frustrated his parental rights. To highlight a few examples, Emily rarely told Tayten the truth about where she was living and working—claiming to be employed when she was not, claiming to live in cities that she did not, and refusing to disclose where the daughter was living. Emily repeatedly told Tayten that she took the daughter to the doctor for issues like diaper rash or a cough when she in fact never had the daughter examined or treated. And as already mentioned, even before the breakup, Emily lied about being enrolled in college and pretended to do online coursework to have free time alone in her room while Brenda cared for the daughter. Emily also rarely allowed Tayten to FaceTime the daughter, refusing all but seven of ninety-one call attempts across a five-month period. And if Tayten upset her, Emily would sometimes threaten to withhold the daughter—once keeping the daughter from Tayten for three straight weeks.

Perhaps the most salient misrepresentations and instability concerned daycare. Emily placed the daughter in five different daycares between May 2023 and March 2024. Emily explained that the disruptions in care for the daughter were due to her various moves and job changes, though one daycare discharged the daughter after Emily incurred numerous fees for no-shows or last-minute changes. Tayten eventually uncovered three daycare locations, though Emily either withheld changes or initially refused to tell him where the daughter was enrolled. Indeed, Tayten only learned of the other two daycare providers during Emily's testimony at trial. And when applying to the most recent daycare center, Emily lied that she had a restraining order against Tayten and Brenda and they were not authorized to pick up the daughter. Only after attorneys intervened was Tayten able to access the daycare and pick up the daughter.

Meanwhile, this case proceeded to trial in June 2024. After two days of testimony, the district court entered an order establishing joint legal custody, placing the daughter in Emily's physical care with liberal visitation for Tayten, and awarding Emily child support. The court reasoned that although Emily's "withholding of information and outright dishonesty" was "troubling" and the daycare switching was "unacceptable," Tayten was "not without a role" in the discord. The court pointed to Tayten's inconsistent expressions of interest in resuming a relationship as likely "confusing" and unfair to Emily. While the court found that Tayten, Brenda, and Emily were all suitable caregivers, it placed heavy weight on Emily's role as the daughter's primary caregiver. And so, "not without reservation," the court placed the daughter in Emily's physical care.

Tayten now appeals.

## II. Physical Care

We review the district court's physical-care determination de novo. *Hensch v. Mysak*, 902 N.W.2d 822, 824 (Iowa Ct. App. 2017). Across our review, we consider "the entire record and decide anew the factual and legal issues preserved and presented." *Id.* Still, we are mindful of the district court's first-hand view of the evidence and give its factual findings due weight, particularly its credibility determinations. *Thrope v. Hostetler*, 949 N.W.2d 1, 5 (Iowa Ct. App. 2020).

Our physical-care standards are well established. We seek to place the daughter "in the environment most likely to bring [her] to health, both physically and mentally, and to social maturity." *Hensch*, 902 N.W.2d at 824 (cleaned up). To guide our analysis, we consider the same factors as those in dissolution proceedings, as well as those detailed in *In re Marriage of Winter*,

223 N.W.2d 165, 166–67 (Iowa 1974). *See* Iowa Code §§ 598.41(3), 600B.40(2).

Giving respectful consideration to the district court's analysis of the daughter's best interest, our de novo review of the record and physical-care factors leads us to a different conclusion. First, while Emily was indeed the historical caregiver for most of the daughter's life, the daughter has endured significant instability in her care. *See In re Marriage of Coulter*, 502 N.W.2d 168, 171 (Iowa Ct. App. 1993) (noting stability "cannot be overemphasized"). In just ten months, Emily moved the daughter between five daycares. And she did so over Tayten and Brenda's consistent offers to have Brenda—who previously ran a daycare—watch the daughter to provide her with stable care. So this is unlike other historical-caregiver cases where the best interest of the child often requires us to pause before uprooting her from a steady home environment. *See In re Marriage of Hansen*, 733 N.W.2d 683, 696–97 (Iowa 2007). To the contrary, placing the daughter in Tayten's physical care promotes stability and consistency for the daughter. *See In re Marriage of Toedter*, 473 N.W.2d 233, 234 (Iowa Ct. App. 1991) (affirming placing children in father's physical care, despite mother being the historical caregiver, when the father would "provide a more stable home").

Second, we are further reluctant to credit Emily's historical-caregiver status "when her role resulted partly from denying" Tayten "access to the child." *Randall v. Trier*, 15 N.W.3d 809, 813 (Iowa Ct. App 2024); *see also* Iowa Code § 598.41(3)(e) (considering whether a "parent can support the other parent's relationship with the child"). For months, Emily refused to disclose the daughter's home location or daycare. As a result, Tayten could not pick up the daughter from daycare to spend extra time with her or otherwise have input in her day-to-day life. So too did Emily refuse to give Tayten his

6

parenting time, sometimes for weeks on end. Parents may not "unilaterally and unreasonably block the other parent's access to the child and then use that artificially created caregiving schedule as support for the parent's claim for physical care." *In re Marriage of Frey*, No. 21-0448, 2022 WL 108952, at *2 (Iowa Ct. App. Jan. 12, 2022); *see also In re Marriage of Quirk-Edwards*, 509 N.W.2d 476, 480 (Iowa 1993) (holding that a parent's limiting of a child's contact with the other parent is a compelling reason to place the child with the other parent that may even override countervailing interests).

And third, Emily has not shown she can truthfully communicate with Tayten about the daughter. *See* Iowa Code § 598.41(3)(c). "A lack of trust poses a significant impediment to effective co-parenting." *Hansen*, 733 N.W.2d at 698. We share the district court's concern about Emily's pattern of dishonesty, and we are particularly troubled by her misstatements about medical care. Emily has not shown that she can keep Tayten informed of the daughter's needs, to the detriment of the daughter's health and wellbeing.

To be sure, Emily is still young—just twenty-one years old at the time of trial. And we agree with the district court that Tayten is not without fault in the breakdown of their communication. But our fidelity is ultimately to the daughter, not what is perhaps most fair for one parent or the other. *Id.* at 695. And on this record, Tayten has shown that he is able to provide stable childcare with help from his mother, he has a strong community of family support, and placement with him will best foster the daughter's relationship with *both* parents.

We thus modify the decree to place the daughter in Tayten's physical care. And we remand the case for the district court to set Emily's visitation schedule and calculate an appropriate child-support award.

### III.    Attorney Fees

Finally, Emily requests appellate attorney fees. We have discretion to award fees to "the prevailing party" in chapter 600B custody cases. Iowa Code § 600B.26.; *see also Hensch*, 902 N.W.2d at 827. But Emily is not the prevailing party in this appeal. So we decline to award appellate attorney fees.

**AFFIRMED AS MODIFIED AND REMANDED.**