# IN THE COURT OF APPEALS OF IOWA

———————————

No. 25-1145
Filed May 13, 2026

———————————

**Joshua Scott Vastine,**
Petitioner–Appellant,

v.

**Stephanie Ali Keough,**
Respondent–Appellee.

———————————

Appeal from the Iowa District Court for Polk County,
The Honorable Celene Gogerty, Judge.

———————————

**AFFIRMED**

———————————

Cathleen J. Siebrecht of Siebrecht Law Firm, Pleasant Hill, attorney for appellant.

Teresa M. Pope of Pope Law, PLLC, Des Moines, attorney for appellee.

———————————

Considered without oral argument
by Tabor, C.J., Langholz, J., and Doyle, S.J.
Opinion by Tabor, C.J.

1

**TABOR, Chief Judge.**

Joshua Vastine and Stephanie Keough have a young son, L.V. Stephanie appeals a district court order awarding Joshua physical care of L.V., subject to her parenting time. As the court found, both parents had significant substance-use issues and were "in basically the same place in their recovery." But the court found Joshua to be more realistic about addressing his addiction, while Stephanie minimized her substance use. After reviewing the record anew, we reach the same conclusion as the district court.[1]

## I.    Facts and Prior Proceedings

Joshua and Stephanie met during inpatient treatment for alcohol addiction in 2018. They began dating and moved in together that December. The following October, L.V. was born. Around the time of L.V.'s first birthday, the parents began drinking again. Their alcohol use spiked in 2021 when the couple went on vacation while L.V. stayed with Joshua's parents. Those grandparents continued to help with L.V.'s care and supported the parents' efforts to maintain sobriety when they returned to Iowa.

But by November 2021, the grandparents were so concerned about the parents' substance use that they petitioned for guardianship of L.V., which the court granted. Joshua and Stephanie then returned to inpatient treatment. Soon thereafter, they ended their relationship and took divergent paths.

---

[1] Visitation and custody issues ancillary to a paternity action are tried in equity. *See* Iowa Code § 600B.40 (2024). "We review the district court's custody determination de novo." *Ruden v. Peach*, 904 N.W.2d 410, 412 (Iowa Ct. App. 2017). We give weight to the district court's findings of fact, including credibility findings, but they are not binding on us. *Id.*

Stephanie successfully completed inpatient treatment and moved to St. Charles, Missouri, to live with her father and continue with outpatient treatment. By September 2022, the paternal grandparents believed Stephanie could safely care for L.V. So the district court ended the guardianship, and L.V. went to live with Stephanie and the maternal grandfather in Missouri. After that, Stephanie reduced L.V.'s contact with his paternal grandparents, eventually stopping it altogether, despite the supportive relationship they previously shared. She also significantly restricted L.V.'s interactions with Joshua and petitioned to change L.V.'s last name.

In October 2022, on the hearing date for that petition, Stephanie overused a medication, Clonazepam, that had been prescribed to help with her alcohol use. Stephanie's father was so concerned that he called the police. When officers arrived at their home, Stephanie picked up L.V., ran across a busy street, lost her balance, and dropped the three-year-old child.

This incident resulted in another emergency guardianship, and L.V. returned to Iowa with Joshua's parents. Stephanie pleaded guilty to child endangerment and received a suspended sentence.[2] She then sought treatment for Clonazepam use, and her new doctor lowered her prescription. She testified her goal is to stop using that medication.

Following her child-endangerment conviction, Stephanie's contact with L.V. was limited. For a year, she had no in-person visits. Her interaction with L.V. restarted slowly with three supervised visits in October 2023, March 2024, and May 2024. As to her alcohol use, she testified that she has been sober since 2021.

---

[2] She remained on probation at the time of trial but testified the charge would be expunged from her record upon its completion.

Meanwhile, Joshua took his own rehabilitative journey. In 2022, he was arrested twice for operating while intoxicated and was placed on probation. He completed inpatient treatment that October, after which he began short, supervised visits with his son. Joshua's parents slowly increased his visitation time with L.V. so long as he took certain steps. For example, they required Joshua to have a negative breathalyzer test before each visit. As part of his probation, Joshua wore a SCRAM bracelet, which monitored his alcohol consumption.[3] But after its removal in 2023, he relapsed, violating his probation. He served time for that violation, and his probation ended that summer. He then began an outpatient treatment program.

His supervised visits with L.V. resumed. His parents required him to take breathalyzer tests and share his location so they could track him. Joshua testified that his parents have supported him and held him accountable for his substance use. By August 2023, L.V. and Joshua had several visits each week, including overnights at Joshua's house. Joshua worked with his parents to understand L.V.'s mental-health, medical, and educational needs.

In April 2024, Joshua petitioned to establish custody, visitation, and support under Iowa Code chapter 600B. The district court issued a temporary order granting Joshua and Stephanie joint legal custody, granting Joshua physical care subject to Stephanie's parenting time and ordering Stephanie to pay child support. While this action was pending, Joshua progressed in his recovery and in building trust with L.V.'s grandparents, so the court ended the second guardianship in March 2025.

The district court considered Joshua's petition in March 2025. It heard testimony from Joshua, Stephanie, Joshua's mother, and Stephanie's

---

[3] SCRAM stands for secure continuous remote alcohol monitor.

significant other. At the time of trial, L.V. lived with Joshua, and Stephanie had visits with L.V. twice a month. Joshua has had stable employment since August 2023. He testified he'd be able to put L.V. on his insurance. Joshua shared a house with his significant other.[4] They had a child together, and his partner has two children who live in the house part time. L.V. is "best friend[s]" with one of those children and chooses to share a room with him.

Stephanie rents a house with her fiancé in Missouri. L.V. has his own room there. Her fiancé has sole custody of his two teenage daughters. Stephanie has worked nine jobs in the last five years[5] and was on maternity leave at the time of trial. During her maternity leave and while her daughter was in the NICU, she picked up a part-time job as a server. Starting after the trial, she had a full-time job lined up as a biller and coder at a laboratory.

At the time of trial, L.V. was five years old and attending a full-day pre-kindergarten school. L.V. went to play therapy and had just switched from one session a week to two. The parents believe L.V. benefits from play therapy. L.V. maintains his relationship with his paternal grandparents and gets along well with the other children on both sides of the family. Under the temporary order, L.V. visited Stephanie in Missouri every other weekend. Joshua testified that the numerous hours traveling every other weekend took a toll on L.V.

After the trial, the district court granted Joshua and Stephanie joint legal custody. The ruling gave Joshua physical care subject to Stephanie's parenting time. Under the parenting plan, Stephanie has time with L.V. every

---

[4] They met while receiving treatment for alcohol use.

[5] The short nature of a few of those jobs is because she worked those jobs through a temporary agency.

other weekend from 6:00 p.m. Friday until 3:00 p.m. Sunday, and the location alternates between Iowa and Missouri so that L.V. only travels to Missouri once a month. Holidays alternate between each parent, and the court gave Stephanie three one-week periods of parenting time during summer breaks. The district court also ordered Stephanie to pay $681.00 per month in child support.[6]

Stephanie appeals.

## II.    Analysis

Stephanie raises three issues on appeal. First, she requests physical care. Second, she seeks more parenting time. Third, she asks to pay less of L.V.'s transportation and lodging expenses. We address each claim in turn.

### A. Physical Care

In deciding physical care, our most important consideration is the child's best interests. *See* Iowa R. App. P. 6.904(3)(n). Joshua and Stephanie were not married, so we operate under Iowa Code chapter 600B. We apply the same legal framework to custody and visitation matters involving unmarried parents as we do to issues arising between parents who had been married to each other. Iowa Code § 600B.40(2) (cross referencing Iowa Code section 598.41).

To determine what care arrangement is in L.V.'s best interests, we consider the factors listed in section 598.41(3). *See In re Marriage of Hansen*, 733 N.W.2d 683, 696 (Iowa 2007) (paraphrasing those nonexclusive factors

---

[6] As part of its findings of fact, the district court noted Joshua has a medical marijuana card, which he maintains for a seizure disorder. It found this "somewhat concerning" but noted "there is no evidence he has abused marijuana."

as "suitability of parents, whether psychological and emotional needs and development of child will suffer from lack of contact with and attention from both parents, quality of parental communication, the previous pattern of caregiving, each parent's support of the other, wishes of the child, agreement of the parents, geographic proximity, and safety"); *see also In re Marriage of Winter*, 223 N.W.2d 165, 166–67 (Iowa 1974) (listing factors to consider). In making a physical-care determination, our goal "is to place the child in an environment most likely to bring the child to healthy physical, mental, and social maturity." *In re Marriage of Courtade*, 560 N.W.2d 36, 38 (Iowa 1996).

Stephanie contends the district court disregarded her historic role as L.V.'s primary caretaker. While she may have taken on greater responsibility when the parents lived together, "no one criterion is determinative." *See Hansen*, 733 N.W.2d at 697. It is important that Joshua has stable employment and has proven he can meet L.V.'s needs, both emotional and physical. Joshua owns a home and allows L.V. to maintain consistent contact with the paternal grandparents, who previously served as his guardians. L.V. gets along well with the other children in their home and has formed a trusted relationship with his play therapist.

To his credit, Joshua supports L.V.'s relationship with Stephanie and the relatives on her side of the family. Joshua testified,

> I just try to keep a healthy relationship between the two of them. That's his mom and I respect that. I want that to be—it's important to me, too.
>
> . . . .
>
> I encourage him to keep in touch with not just his mom but his relatives, his cousins down in St. Charles. And she does FaceTime every night. He does FaceTime her every single night before bed.

In contrast, Stephanie cut off L.V.'s contact with his father and paternal grandparents when L.V. was in her care. True, she testified that she had been angry with Joshua then, and she now supports his relationship L.V. But she was critical that Joshua "enable[d]" and "spoiled" L.V. because he needed help tying his shoes and getting in and out of the car.

Beyond this, we share the district court's concern that Stephanie does not demonstrate a full understanding of how her addiction impacts her parenting. She testified that the 2021 guardianship over L.V. was unnecessary, despite both her and Joshua's relapses.[7] And like the district court, we find it troubling that Stephanie keeps many unused prescription drugs in her house. Testimony revealed she does not always take her medication but she still gets her prescriptions filled. When asked if she has any concerns about having "excess Hydroxyzine, Trazodone, Topiramate, Fluoxetine, and Clonazepam in her home" given her history of addiction, she answered, "Not at all."

Considering the whole record, we find that Joshua will continue to foster L.V.'s relationship with his mother. And because Joshua provides an environment more "likely to bring the child to healthy physical, mental, and social maturity," it is in L.V.'s best interests for Joshua to have physical care. *Courtade*, 560 N.W.2d at 38.

## B. Parenting Time

In the alternative to her argument for physical care, Stephanie contends the district court should have granted her "more extensive summer

---

[7] To Stephanie's credit, she testified that she does not believe she's a good parent under the influence of any substance and doesn't want L.V. to witness her in that state. But that recognition conflicts with her testimony that the guardianship should not have been entered in 2021.

visitation with the child and time during all other school breaks, given the distance between the parties' residences." She requests "a majority of the summer break" and more time during fall, winter, and spring breaks.

When establishing a plan for parenting time, the child's best interests remain our top consideration. *In re Marriage of Stepp*, 485 N.W.2d 846, 849 (Iowa Ct. App. 1992). Iowa Code section 598.41(1)(a) provides for "liberal visitation rights where appropriate, which will assure the child the opportunity for the maximum continuing physical and emotional contact with both parents." Granting liberal visitation must be "reasonable and in the best interest of the child." Iowa Code § 598.41(1)(a).

The court's order gives Stephanie three one-week periods during summer break and alternates care each year between Stephanie and Joshua for L.V.'s Thanksgiving, winter, and spring breaks. It's unclear what additional time Stephanie would like during those shorter breaks. As to summer, Stephanie emphasizes that courts can offer longer stretches of parenting time over summer breaks to ensure maximum contact with both parents. *See In re Marriage of Thielges*, 623 N.W.2d 232, 238 (Iowa Ct. App. 2000).

True, the district court could have granted Stephanie more visitation during the summer, but it is not in L.V.'s best interests to have that extended time in her care. As discussed, Stephanie has not shown a complete appreciation of how her addiction affects her parenting. Given the lingering concerns, the district court established an appropriate parenting plan that balances L.V.'s best interests with reasonable contact with his mother.

### C. Transportation Costs

Lastly, Stephanie argues the district court erred in assigning her most of the travel and lodging expenses associated with her in-person visits with L.V. She asks that both parents share the expenses equally or that we deviate from the child support guidelines and lower her child support obligation.

Determining who is responsible for transportation expenses depends on the facts of each case. *Zamora v. Gonzales*, No. 23-1281, 2025 WL 855364, at *3 (Iowa Ct. App. Mar. 19, 2025). Here, it is equitable for Stephanie to bear the brunt of those costs. *See Collins v. Natera*, No. 18-2060, 2019 WL 6358431, at *7 (Iowa Ct. App. Nov. 27, 2019) (collecting cases assigning transportation costs to noncustodial parent who voluntarily moved away). Stephanie voluntarily moved to Missouri after the first guardianship was established. And the record shows that she has a slightly greater income. Plus, at the time of trial her child support obligations were past due. Thus, we decline to modify the allocation of transportation costs, nor do we modify her child support obligation.

### D. Attorney Fees

Both parties request appellate attorney fees. It is within our discretion whether to award attorney fees on appeal. *Markey v. Carney*, 705 N.W.2d 13, 26 (Iowa 2005). We focus on the parties' relative financial positions, but we also consider the merits of the appeal and whether the requesting party was obliged to defend the district court's rulings. *Id*.

Although Joshua prevails in this action, the record shows that the parties have comparable incomes and Stephanie remains responsible for most of the travel costs. On this record, we decline to award attorney fees.

**AFFIRMED.**